# EXHIBIT 1

Prospectus Supplement dated March 29, 2006 (to Prospectus dated March 29, 2006)

## $910,833,000



### Impac Funding Corporation
Master Servicer and Sponsor

### Impac Secured Assets Corp.
Depositor

## Mortgage Pass-Through Certificates, Series 2006-1

> You should consider carefully the risk factors beginning on page S-13 in this prospectus supplement.

**The Trust**

The trust will consist primarily of two groups of mortgage loans:

- the first group will consist of adjustable and fixed-rate, first and second lien, one-to-four family residential mortgage loans; and

- the second group will consist of adjustable-rate, first lien multifamily mortgage loans.

The trust will be represented by twenty-five classes of certificates, twenty of which are offered under this prospectus supplement.

**Credit Enhancement**

The offered certificates will have credit enhancement in the form of excess interest and overcollateralization, cross-collateralization between the loan groups to cover realized losses and subordination.

In addition, two interest rate swap agreements will be available to cover certain interest shortfalls, amounts necessary to maintain or restore the required level of overcollateralization, net WAC shortfall amounts and realized losses.

The price to investors will vary from time to time and will be determined at the time of sale. The proceeds to the company from the offering will be approximately 99.56% of the aggregate certificate principal balance of the offered certificates, less expenses estimated to be approximately $900,000.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.

## Bear, Stearns & Co. Inc.
### Countrywide Securities Corporation
### Merrill Lynch & Co.

Underwriters

**Important notice about information presented in this prospectus supplement
and the accompanying prospectus**

**You should rely on the information contained in this document. We have not authorized anyone to provide you with different information.**

We provide information to you about the offered certificates in two separate documents that provide progressively more detail:

- the accompanying base prospectus, which provides general information, some of which may not apply to this series of certificates; and

- this prospectus supplement, which describes the specific terms of this series of certificates.

The Depositor's principal offices are located at 1401 Dove Street, Newport Beach, CA 92660 and its phone number is (949) 475-3600.

**Table of Contents**

**Prospectus Supplement**

Page

SUMMARY OF PROSPECTUS SUPPLEMENT ................................................................. S-4
RISK FACTORS ................................................................................................................ S-13
THE MORTGAGE POOL ................................................................................................. S-26
STATIC POOL INFORMATION ...................................................................................... S-97
THE ISSUING ENTITY ..................................................................................................... S-97
THE DEPOSITOR .............................................................................................................. S-98
THE SPONSOR .................................................................................................................. S-98
PERMITTED INVESTMENTS ......................................................................................... S-99
YIELD ON THE CERTIFICATES .................................................................................. S-101
DESCRIPTION OF THE CERTIFICATES .................................................................... S-134
POOLING AND SERVICING AGREEMENT .............................................................. S-155
FEDERAL INCOME TAX CONSEQUENCES ............................................................. S-168
METHOD OF DISTRIBUTION ...................................................................................... S-174
SECONDARY MARKET ................................................................................................ S-174
LEGAL OPINIONS .......................................................................................................... S-175
LEGAL PROCEEDINGS ................................................................................................. S-175
AFFILIATIONS, RELATIONSHIPS AND RELATED TRANSACTIONS ................. S-175
RATINGS ......................................................................................................................... S-175
LEGAL INVESTMENT ................................................................................................... S-176
ERISA CONSIDERATIONS ........................................................................................... S-177
AVAILABLE INFORMATION ...................................................................................... S-179
REPORTS TO CERTIFICATEHOLDERS ..................................................................... S-179
INCORPORATION OF INFORMATION BY REFERENCE ....................................... S-180
GLOSSARY ..................................................................................................................... S-181
ANNEX I ............................................................................................................................ I-1

**The Issuing Entity**

The certificates will be issued by Impac Secured Assets Trust 2006-1, a New York common law trust pursuant to a pooling and servicing agreement dated as of March 1, 2006 among the depositor, the master servicer and the trustee. On the closing date, the depositor will deposit into the trust the mortgage loans. Impac Secured Assets Trust 2006-1 will issue twenty-five classes of certificates representing the trust, twenty of which are offered by this prospectus supplement.

The certificates represent in the aggregate the entire beneficial ownership interest in the trust. Distributions of interest and/or principal on the offered certificates will be made only from payments received from the trust as described below.

The Class C-R, Class C-M, Class P-R, Class P-M and Class R Certificates are the classes of certificates that are not offered by this prospectus supplement.

In addition, the trustee will establish the supplemental interest trust that will hold two interest rate swap agreements for the benefit of the certificateholders (other than the Class 1-A-1-1 certificateholders and Class 1-A-1-2 certificateholders).

See "Description of the Certificates" in this prospectus supplement.

**The Mortgage Loans**

The mortgage loans will be divided into two mortgage loan groups, loan group 1 and loan group 2.

With respect to each loan group, the statistical information included in this prospectus supplement with respect to the mortgage loans in such loan Group is based on a pool of sample mortgage loans as of the statistical pool calculation date. The characteristics of the final groups will not materially differ from the information provided with respect to the sample groups. Unless otherwise specified, all percentages described with respect to the sample mortgage loans are calculated based on the aggregate principal balance of the sample mortgage loans as of the statistical pool calculation date. It is expected that mortgage loans will be added to and certain sample mortgage loans will be deleted from the pool of sample mortgage loans to constitute the final groups of mortgage loans.

Approximately 0.03%, 1.80%, 39.47% and 11.63% of the sample mortgage loans, by aggregate outstanding principal balance as of the statistical pool calculation date, are interest only for the first two years, three years, five years and ten years, respectively, after origination. As a result, no principal payments will be received with respect to these mortgage loans during this period except in the case of a prepayment.

*Loan Group 1*

The mortgage loans in loan group 1 will be divided into two mortgage loan groups, loan group 1-A-1 and loan group 1-A-2.

The mortgage loans in loan group 1-A-1 are one- to four-family, fixed-rate residential mortgage loans secured by first liens on the related mortgaged property with mortgage loan balances at origination that may or may not conform to Fannie Mae or Freddie Mac loan limits. The mortgage loans in loan group 1-A-1 will include fully amortizing, interest-only and balloon mortgage loans.

The mortgage loans in loan group 1-A-2 are one- to four-family, fixed-rate and adjustable-rate residential mortgage loans secured by first and second liens on the related mortgaged property with mortgage loan balances at origination that may or may not conform to Fannie Mae or Freddie Mac loan limits. The mortgage loans in loan group 1-A-2 will include fully amortizing, interest-only and balloon mortgage loans.

The interest rate on the adjustable-rate mortgage loans in loan group 1-A-2 will adjust on each adjustment date to equal the sum of the related index and the related gross margin on such

| | |
|---|---|
| Range of mortgage rates (approximate): | 5.875% to 8.750% |
| Weighted average mortgage rate (approximate): | 6.530% |
| Weighted average remaining term to stated maturity (approximate): | 358 months |
| Range of principal balances (approximate): | $90,000 to $7,194,230 |
| Average principal balance: | $947,411 |
| Range of loan-to-value ratios (approximate): | 16.25% to 80.00% |
| Weighted average loan-to-value ratio (approximate): | 67.46% |

For additional information regarding the mortgage loans, see "The Mortgage Pool" in this prospectus supplement.

### Removal and Substitution of a Mortgage Loan

The trustee will acknowledge the sale, transfer and assignment of the trust fund to it by the depositor and receipt of, subject to further review and any exceptions, the mortgage loans. If the trustee finds that any mortgage loan is defective on its face due to a breach of the representations and warranties with respect to that loan made in the transaction agreements, the trustee shall promptly notify the sponsor of such defect. The sponsor must then correct or cure any such defect within 90 days from the date of notice from the trustee of the defect and if the sponsor fails to correct or cure such defect within such period and such defect materially and adversely affects the interests of the certificateholders in the related mortgage loan, the sponsor will, in accordance with the terms of the pooling and servicing agreement, within 90 days of the date of notice, provide the trustee with a substitute mortgage loan (if within two years of the closing date); provided that, if such defect would cause the mortgage loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Internal Revenue Code, any such cure or substitution must occur within 90 days from the date such breach was discovered

### The Offered Certificates

*Priority of Distributions from Loan Group 1.* In general, on any distribution date, funds available for distribution from payments and other amounts received on the mortgage loans in loan group 1, after the payment of certain fees and expenses and any related net swap payments or any related swap termination payments payable to the swap provider (other than a swap termination payment resulting from a swap provider trigger event), will be distributed in the following order:

*Interest Distributions*

first, to pay current interest and any previously unpaid interest, concurrently, on the Class 1-A Certificates; and

second, to pay current interest, sequentially, on the Class 1-M-1, Class 1-M-2, Class 1-M-3, Class 1-M-4, Class 1-M-5, Class 1-M-6, Class 1-M-7, Class 1-M-8 and Class 1-B Certificates, in that order of priority.

*Principal Distributions*

Amounts available after distributions of interest on the group 1 certificates will be used to pay principal on these certificates (including the payment of amounts to maintain overcollateralization), but only in the order of priority and in the amounts described herein.

*Net Monthly Excess Cashflow Distributions*

Amounts available after distributions of interest and principal as described above will be the related net monthly excess cashflow and will be used for various purposes, including building and maintaining the required level of overcollateralization with respect to the related and non-related loan groups and making distributions for reimbursement of losses.

• the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience.

Depending on the provisions of the applicable law and the specific facts and circumstances involved, violations of these federal or state laws, policies and principles may limit the ability of the trust to collect all or part of the principal of or interest on the mortgage loans, may entitle the borrower to a refund of amounts previously paid and, in addition, could subject the trust to damages and administrative enforcement. *See "Legal Aspects of Mortgage Loans —Consumer Compliance Laws and Regulations" in the prospectus.*

The sponsor will represent that as of the closing date, to the best of sponsor's knowledge, each mortgage loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, truth-in-lending and disclosure laws. The sponsor will also represent that each mortgage loan is being serviced in all material respects in accordance with applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity and disclosure laws. In the event of a breach of this representation, it will be obligated to cure the breach or repurchase or replace the affected mortgage loan in the manner described in the prospectus.

**There May Be Variations in the Mortgage Loans from the Sample Mortgage Loans**

The sample mortgage loans include mortgage loans whose characteristics may vary from the specific characteristics reflected in the final pool of mortgage loans, although the extent of such variance is not expected to be material. Within 15 days of the closing date, tables will be filed on Form 8-K reflecting the mortgage loans.

**The Ratings on the Offered Certificates Are Not a Recommendation to Buy, Sell or Hold the Offered Certificates and Are Subject to Withdrawal at Any Time, Which May Result in Losses on the Offered Certificates**

It is a condition to the issuance of the offered certificates that each class of offered certificates be rated no lower than the ratings described on page S-5 of this prospectus supplement. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time. No person is obligated to maintain the rating on any offered certificate, and, accordingly, there can be no assurance that the ratings assigned to any offered certificate on the date on which the offered certificates are initially issued will not be lowered or withdrawn by a rating agency at any time thereafter. In the event any rating is revised or withdrawn, the liquidity or the market value of the related offered certificates may be adversely affected. *See "Ratings" in this prospectus supplement and in the prospectus.*

**The Recording of Mortgages in the Name of MERS May Affect the Yield on the Certificates.**

The mortgages or assignments of mortgage for some of the mortgage loans have been or may be recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the sponsor and its successors and assigns. Subsequent assignments of those mortgages are registered electronically through the MERS® System. However, if MERS discontinues the MERS® System and it becomes necessary to record an assignment of the mortgage to the trustee, then any related expenses shall be paid by the trust and will reduce the amount available to pay principal of and interest on the subordinate certificates.

The recording of mortgages in the name of MERS is a new practice in the mortgage lending industry. Public recording officers and others may have limited, if any, experience with lenders seeking

standard program guidelines. An exception may be allowed if the loan application reflects certain compensating factors, including instances where the prospective mortgagor:

- has demonstrated an ability to save and devote a greater portion of income to basic housing needs;

- may have a potential for increased earnings and advancement because of education or special job training, even if the prospective mortgagor has just entered the job market;

- has demonstrated an ability to maintain a debt free position;

- may have short term income that is verifiable but could not be counted as stable income because it does not meet the remaining term requirements; and

- has net worth substantial enough to suggest that repayment of the loan is within the prospective mortgagor's ability.

*Appraisals.* The Originator does not publish an approved appraiser list for the conduit seller. Each conduit seller maintains its own list of appraisers, provided that each appraiser must:

- be a state licensed or certified appraiser;

- meet the independent appraiser requirements for staff appraisers, or, if appropriate, be on a list of appraisers specified by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC and the Office of Thrift Supervision under their respective real estate appraisal regulations adopted in accordance with Title XI of the Financial Institutions Reform Recovery and Enforcement Act of 1989, regardless of whether the seller is subject to those regulations;

- be experienced in the appraisal of properties similar to the type being appraised;

- be actively engaged in appraisal work; and

- subscribe to a code of ethics that is at least as strict as the code of the American Institute of Real Estate Appraisers or the Society of Real Estate Appraisers.

With respect to the Originator's Progressive Series Program or Progressive Express™ Program in general one full appraisal is required on each loan. In addition, an automated valuation model, or AVM, or a quantitative appraisal report (Fannie Mae Form 2055), or a Hansen Pro, or enhanced desk review is obtained either (a) when the loan to value ratio is 90.01% to 95% or (b) when the property has multiple units and the loan to value ratio is greater than 80%, or (c) the loan is a Progressive Express™ No Doc Program and the loan to value ratio is 80.01% to 90%. In addition, a quantitative appraisal report (Fannie Mae Form 2055), or a Hansen Pro, or enhanced desk review is obtained when the loan is a Progressive Express™ No Doc Program and the loan to value ratio is equal to or greater than 90.01%. An enhanced field review is also required when the loan to value ratio is equal to or greater than 95.01% or when the loan amount is above $500,000 or the property is located in Georgia and the loan to value ratio is 70.01% and above. Generally, when the loan amount is greater than $750,000 but less than $1,500,000, a full appraisal with interior photos plus a Fannie Mae Form 2055 are required or when the loan amount is greater than $1,500,000, two full appraisals with interior photos are required. At the underwriter's discretion, any one of the above appraisal reviews may be required when program parameters do not require an appraisal review. The Originator has developed expanded underwriting guidelines for appraisal requirements on the Progressive Series Program to include, when the loan amount is $1,000,000 or less,

judgments. Generally, the primary borrower's minimum middle credit score is 640. Generally, when the credit report indicates delinquent payments and the borrower's average credit score is below 680, the borrower may be required to explain all delinquencies over 30 days past due and all accounts must be brought current before closing. When the borrower's average credit score is between 680 and 720, the borrower may be required to explain all delinquencies within 24 months of the application date and all accounts must be current before closing. When the borrower's average credit score is greater than 720, the borrower may be required to explain long term debt (installment/mortgage) delinquencies within 24 months of the application and all accounts must be brought current prior to closing. Bankruptcy must be at least 60 months old, fully discharged and the borrower must have re established or re affirmed satisfactory credit history. Foreclosures are not allowed in the past 5 years. Any judgments or tax liens in excess of $1,000 per occurrence or an aggregate of $3,000 must be paid in full prior to closing.

*Management Experience.* The IMCC Program takes into account that an apartment building containing five to nine units is typical of the "starter" market for the beginning real estate investor. Thus, five to nine unit properties will generally not need management letters to be supplied, since it is assumed that these properties will be owner managed by "starters" as well as experienced owners. For properties 10 units and larger, management experience is normally required. IMCC may deny the loan request based on insufficient management experience (generally, where the borrower has not demonstrated the necessary ability to manage investment real estate within the past three years). If the loan is granted upon other extenuating reasons, a management letter may be required, plus satisfactory review of a management agreement and qualifications of the manager.

In addition, see "The Mortgage Pools—Underwriting Criteria" in the prospectus.

**Additional Information**

The description in this prospectus supplement of the sample mortgage loans and the mortgaged properties is based upon the sample mortgage pool as of the Statistical Pool Calculation Date, as adjusted for the scheduled principal payments due on or before this date. However, many of the sample mortgage loans may not be included in the trust as mortgage loans as a result of incomplete documentation or otherwise if the Depositor deems this removal necessary or desirable, and may be prepaid at any time. The characteristics of each final loan group will not materially differ from the information provided with respect to each sample loan group. Within 15 days of the Closing Date, tables reflecting the composition of the mortgage loans in each loan group will be filed on Form 8-K with the Commission.

## STATIC POOL INFORMATION

The Depositor will provide static pool information, material to this offering, with respect to the experience of the originator in securitizing asset pools of the same type at http://regabimpacisac.com.

Information provided through the Internet address above will not be deemed to be a part of this prospectus or the registration statement for the securities offered hereby if it relates to any prior securities pool or vintage formed before January 1, 2006, or with respect to the mortgage pool (if applicable) any period before January 1, 2006.

## THE ISSUING ENTITY

Impac Secured Assets Trust 2006-1 is a common law trust formed under the laws of the State of New York pursuant to the pooling and servicing agreement between the Depositor, Sponsor, Master Servicer and the Trustee, dated as of March 1, 2006. The Agreement constitutes the "governing instrument" under the laws of the State of New York. After its formation, the Impac Secured Assets Trust 2006-1 will not engage in any activity other than (i) acquiring and holding the mortgage loans and the

other assets of the Trust and proceeds therefrom, (ii) issuing the Certificates, (iii) making payments on the Certificates and (iv) engaging in other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith. The foregoing restrictions are contained in the Agreement. These restrictions cannot be amended without the consent of holders of Certificates evidencing at least 66-2/3% of the voting rights. For a description of other provisions relating to amending the Agreement, please see "The Agreements—Amendment" in the base prospectus.

The assets of the Impac Secured Assets Trust 2006-1 will consist of the mortgage loans and certain related assets. Impac Secured Assets Trust 2006-1's fiscal year end is December 31.

## THE DEPOSITOR

The Depositor, Impac Secured Assets Corp., was incorporated in the state of Delaware in 1996 as ICIFC Secured Assets Corp., and is a wholly-owned subsidiary of Impac Funding Corporation. The Depositor changed its name to Impac Secured Assets Corp. in 1998. The Depositor was organized for the sole purpose of serving as a private secondary mortgage market conduit. The Depositor does not have, nor is it expected in the future to have, any significant assets. See "The Sponsor" below for information regarding the size, composition and growth of the total portfolio of assets for which Impac Secured Assets Corp. has served as Depositor.

The Depositor has been serving as a private secondary mortgage market conduit for residential mortgage loans since 1998. Since that time it has been involved in the issuance of securities backed by residential mortgage loans in excess of $12 billion. In conjunction with the Sponsor's acquisition of mortgage loans, the Depositor will execute a mortgage loan purchase agreement through which the loans will be transferred to itself. These loans are subsequently deposited in a common law or statutory trust, described in this prospectus supplement, which will then issue the certificates.

After issuance and registration of the securities contemplated in this prospectus supplement and any supplement hereto, the Depositor will have no duties or responsibilities with respect to the pool assets or the securities.

The Depositor's principal executive offices are located at 1401 Dove Street, Newport Beach, CA 92660. Its telephone number is (949) 475-3600.

## THE SPONSOR

The Sponsor, Impac Funding Corporation, in its capacity as mortgage loan seller, will sell the mortgage loans to the Depositor pursuant to a Mortgage Loan Purchase Agreement, dated as of March 30, 2006, between the Sponsor and the Depositor.

The Sponsor was incorporated in the State of California in August 1995 and is an affiliate of the Depositor. The Sponsor commenced operation in California in 1995.

The Sponsor maintains its principal office at 1401 Dove Street, Newport Beach, CA 92660. Its telephone number is (949) 475-3600.

The Sponsor is a mortgage company that acquires, purchases and sells primarily first-lien non-conforming Alt-A mortgage loans from a network of third party correspondents, mortgage bankers, and brokers.

The Sponsor has been securitizing residential mortgage loans since 1995. The Sponsor securitized residential mortgage loans in two transactions with an aggregate principal balance of $883,975,000 during

## POOLING AND SERVICING AGREEMENT

**General**

The certificates will be issued pursuant to the Agreement, a form of which is filed as an exhibit to the registration statement. A Current Report on Form 8-K relating to the certificates containing a copy of the Agreement as executed will be filed by the Depositor with the Securities and Exchange Commission within fifteen days of the initial issuance of the certificates. The Trust Fund created under the Agreement will consist of the following: (1) the mortgage loans; (2) collections in respect of principal and interest on the mortgage loans received after the Cut-off Date (other than payments due on or before the Cut-off Date); (3) the amounts on deposit in any Certificate Account (as defined in the prospectus); (4) certain insurance policies maintained by the related mortgagors or by or on behalf of the Master Servicer or related subservicer in respect of the mortgage loans; (5) an assignment of the Depositor's rights under the Mortgage Loan Purchase Agreement; (6) the Interest Rate Swap Agreements; (7) the Net WAC Shortfall Reserve Fund; and (8) proceeds of the foregoing. Reference is made to the prospectus for important information in addition to that set forth in this prospectus supplement regarding the Trust Fund, the terms and conditions of the Agreement and the Offered Certificates. The Offered Certificates will be transferable and exchangeable at the office designated by the Trustee for such purposes located in Santa Ana, California. The Depositor will provide to prospective or actual certificateholders without charge, on written request, a copy (without exhibits) of the Agreement. Requests should be addressed to the Secretary, Impac Secured Assets Corp., 1401 Dove Street, Newport Beach, CA 92660 and its phone number is (949) 475-3600.

**Assignment of the Mortgage Loans**

The Depositor will deliver to the Trustee with respect to each mortgage loan (1) the mortgage note endorsed without recourse to the Trustee to reflect the transfer of the mortgage loan, (2) the original mortgage with evidence of recording indicated thereon and (3) an assignment of the mortgage in recordable form to the Trustee, reflecting the transfer of the mortgage loan.

In addition, the Sponsor made certain representations and warranties to the Depositor in the mortgage loan purchase agreement with respect to the mortgage loans. The Trustee will be assigned all right, title and interest in the mortgage loan purchase agreement insofar as they relate to such representations and warranties made by the Sponsor.

The representations and warranties of the Sponsor with respect to the mortgage loans include the following, among others:

(a)   The information set forth in the mortgage loan schedule is true, complete and correct in all material respects as of the Closing Date;

(b)   Immediately prior to the sale of the mortgage loans pursuant to the mortgage loan purchase agreement, the Sponsor was the sole owner of beneficial title and holder of each mortgage and mortgage note relating to the mortgage loans and as of the Closing Date, or as of another specified date, is conveying the same to the Depositor free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, mechanics' lien, assessment, claim or security interest, and the Sponsor has full right and authority to sell and assign each mortgage loan pursuant to the mortgage loan purchase agreement;

(c)   As of the Closing Date, the improvements on each mortgaged property securing a mortgage loan are insured (by an insurer which is acceptable to the Sponsor) against loss by fire, flood and such hazards as are covered under a standard extended coverage endorsement in the locale in which the mortgaged property is located, in an amount which is not less than the lesser of the maximum

insurable value of the improvements securing such mortgage loan or the outstanding principal balance of the mortgage loan, but in no event in an amount less than an amount that is required to prevent the mortgagor from being deemed to be a co-insurer thereunder;

(d) Except to the extent insurance is in place which will cover such damage, the physical property subject to any mortgage is free of material damage and is in good repair and there is no proceeding pending or threatened for the total or partial condemnation of any mortgaged property;

(e) The mortgaged property and all improvements thereon comply with all requirements of any applicable zoning and subdivision laws and ordinances;

(f) A lender's title insurance policy (on an ALTA or CLTA form) or binder, or other assurance of title customary in the relevant jurisdiction therefor in a form acceptable to Fannie Mae or Freddie Mac, was issued on the date that each mortgage loan was created by a title insurance company which, to the best of the Sponsor's knowledge, was qualified to do business in the jurisdiction where the related mortgaged property is located, insuring the Sponsor and its successors and assigns that the mortgage is a first priority lien on the related mortgaged property in the original principal amount of the mortgage loan. The Sponsor is the sole insured under such lender's title insurance policy, and such policy, binder or assurance is valid and remains in full force and effect, and each such policy, binder or assurance shall contain all applicable endorsements including a negative amortization endorsement, if applicable;

(g) As of the Closing Date there is no material monetary default existing under any mortgage or the related mortgage note and there is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach or event of acceleration; and neither the Sponsor nor any of its respective affiliates has taken any action to waive any default, breach or event of acceleration; and no foreclosure action is threatened or has been commenced with respect to the mortgage loan;

(h) Neither the Sponsor nor any prior holder of any mortgage has impaired, waived, altered or modified the mortgage or mortgage notes in any material respect (except that a mortgage loan may have been modified by a written instrument which has been recorded, if necessary to protect the interests of the owner of such mortgage loan or the Certificates, and which has been delivered to the Trustee); satisfied, canceled or subordinated such mortgage in whole or in part; released the applicable mortgaged property in whole or in part from the lien of such mortgage; or executed any instrument of release, cancellation or satisfaction with respect thereto; and

(i) At the time of origination, if required, each mortgaged property was the subject of an appraisal which conforms to the underwriting requirements of the related originator; the mortgage file contains an appraisal of the applicable mortgaged property.

In the case of a breach of any representation or warranty set forth above which materially and adversely affects the value of the interests of the certificateholders or of the Depositor in any of the mortgage loans, the Sponsor shall, within 90 days from the date of its discovery or receipt of notice thereof, cure such breach or repurchase event in all material respects or shall either (i) repurchase such mortgage loan from the Issuing Entity at the repurchase price, or (ii) substitute one or more eligible substitute mortgage loans for such mortgage loan, in each case in the manner and subject to the conditions set forth in mortgage loan purchase agreement. The obligations of the Sponsor to cure, repurchase or substitute shall constitute the sole and exclusive remedy respecting a breach of such representations and warranties available to the Depositor, the Issuing Entity and the certificateholders against the Sponsor.

Plan fiduciaries should consult their legal counsel concerning the availability of, and scope of relief provided by, the Exemption and the enumerated class exemptions, and the potential consequences in their specific circumstances, prior to making an investment in the Offered Certificates. Moreover, each Plan fiduciary should determine whether under the general fiduciary standards of investment prudence and diversification, an investment in the Offered Certificates is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.

The sale of any class of Offered Certificates to a Plan is in no respect a representation by the Company, the Trustee, the Master Servicer or the Underwriters that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

## AVAILABLE INFORMATION

The Depositor is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the Commission. Reports and other information filed by the Depositor can be inspected and copied at the Public Reference Room maintained by the Commission at 100 F Street, NE, Washington, DC 20549, and its Regional Offices located as follows: Chicago Regional Office, 500 West Madison, 14th Floor, Chicago, Illinois 60661; New York Regional Office, 233 Broadway, New York, New York 10279. Copies of the material can also be obtained from the Public Reference Section of the Commission, 100 F Street, NE, Washington, DC 20549, at prescribed rates and electronically through the Commission's Electronic Data Gathering, Analysis and Retrieval system at the Commission's Website (http://www.sec.gov). Information about the operation of the Public Reference Room may be obtained by calling the Securities and Exchange Commission will be filed under the Issuing Entity's name. The Depositor does not intend to send any financial reports to certificateholders.

The Issuing Entity's annual reports on Form 10-K (including reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance, discussed in "Pooling and Servicing Agreement—Reports to Certificateholders" and "—Evidence as to Compliance", required to be filed under Regulation AB), periodic distribution reports on Form 10-D, current reports on Form 8-K and amendments to those reports, together with such other reports to certificateholders or information about the securities as shall have been filed with the Commission will be posted on the Sponsor's internet web site as soon as reasonably practicable after it has been electronically filed with, or furnished to, the Commission. The address of the website is: http://regabimpacisac.com.

## REPORTS TO CERTIFICATEHOLDERS

The Master Servicer will be required to provide periodic unaudited reports concerning the Trust Fund to all registered holders of Offered Certificates with respect to the Trust Fund as are required under the Exchange Act and the Commission's related rules and regulations, and under the terms of the applicable agreements.

So long as the Issuing Entity is required to file reports under the Exchange Act, those reports will be made available as described above under "Available Information".

If the Issuing Entity is no longer required to file reports under the Exchange Act, periodic distribution reports will be posted on the Sponsor's website referenced above under "Available Information" as soon as practicable. Annual reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance will be provided to registered holders of the Certificates upon request free of charge. See "Pooling and Servicing Agreement—Evidence as to Compliance" and "—Reports to Certificateholders."

## INCORPORATION OF INFORMATION BY REFERENCE

There are incorporated in this prospectus supplement by reference all documents, including but not limited to the financial statements and reports filed or caused to be filed or incorporated by reference by the Depositor with respect to the Trust Fund pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, prior to the termination of the offering of the Offered Certificates. All documents subsequently filed by the Depositor pursuant to Sections 13(a) or 15(d) of the Exchange Act in respect of any offering prior to the termination of the offering of the Offered Certificates will also be deemed incorporated by reference into this prospectus supplement.

The Depositor will provide or cause to be provided without charge to each person to whom this prospectus supplement is delivered in connection with the offering of one or more classes of Offered Certificates, upon written or oral request of the person, a copy of any or all the reports incorporated in this prospectus supplement by reference, in each case to the extent the reports relate to one or more of such classes of the Offered Certificates, other than the exhibits to the documents, unless the exhibits are specifically incorporated by reference in the documents. Requests should be directed in writing to Impac Secured Assets Corp., 1401 Dove Street, Newport Beach, California 92660, or by telephone at (949) 475 3600. The Depositor has determined that its financial statements will not be material to the offering of any Offered Certificates.

# IMPAC SECURED ASSETS CORP.
Company

*MORTGAGE PASS-THROUGH CERTIFICATES*
*MORTGAGE-BACKED NOTES*

> **You should consider carefully the risk factors in the prospectus supplement.**

**The Offered Securities**
The company proposes to establish one or more trusts to issue and sell from time to time one or more classes of offered securities, which shall be mortgage pass-through certificates or mortgage-backed notes.

**The Trust Fund**
Each series of securities will be secured by a trust fund consisting primarily of a segregated pool of mortgage loans, including:

- mortgage loans secured by first and junior liens on the related mortgage property;
- home equity revolving lines of credit;
- mortgage loans where the borrower has little or no equity in the related mortgaged property;
- mortgage loans secured by one- to four-family residential properties;
- mortgage loans secured by multifamily properties;
- mortgage loans secured by commercial properties and mixed residential and commercial properties, provided that the concentration of these properties is less than 10% of the pool; and manufactured housing conditional sales contracts and installment loan agreements or interests therein;

in each case acquired by the company from one or more affiliated or unaffiliated institutions.

**Credit Enhancement**
If so specified in the related prospectus supplement, the trust for a series of securities may include any one or any combination of a financial guaranty insurance policy, mortgage pool insurance policy, letter of credit, special hazard insurance policy or reserve fund, and currency or interest rate exchange agreements. In addition to or in lieu of the foregoing, credit enhancement may be provided by means of subordination of one or more classes of securities, by cross-support or by overcollateralization.

The offered securities may be offered to the public through different methods as described in "Methods of Distribution" in this prospectus.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities offered hereby or determined that this prospectus or the prospectus supplement is truthful or complete. Any representation to the contrary is a criminal offense.**

The date of this prospectus is March 29, 2006.

# TABLE OF CONTENTS

| Caption | Page |
| --- | --- |
| INTRODUCTION | 4 |
| General | 4 |
| THE MORTGAGE POOLS | 5 |
| General | 5 |
| The Mortgage Loans | 7 |
| Underwriting Standards | 11 |
| Qualifications of Originators and Sellers | 13 |
| Representations by Sellers | 14 |
| SERVICING OF MORTGAGE LOANS | 17 |
| General | 17 |
| The Master Servicer | 17 |
| Collection and Other Servicing Procedures; Mortgage Loan Modifications | 17 |
| Subservicers | 20 |
| Special Servicers | 20 |
| Realization Upon or Sale of Defaulted Mortgage Loans | 20 |
| Servicing and Other Compensation and Payment of Expenses; Retained Interest | 23 |
| Evidence as to Compliance | 24 |
| DESCRIPTION OF THE SECURITIES | 25 |
| General | 25 |
| Form of Securities | 26 |
| Global Securities | 27 |
| Assignment of Trust Fund Assets | 31 |
| Certificate Account | 33 |
| Distributions | 37 |
| Distributions of Interest and Principal on the Securities | 38 |
| Pre-Funding Account | 39 |
| Distributions on the Securities in Respect of Prepayment Premiums | 39 |
| Allocation of Losses and Shortfalls | 40 |
| Advances | 40 |
| Reports to Securityholders | 41 |
| DESCRIPTION OF CREDIT ENHANCEMENT | 42 |
| General | 42 |
| Subordinate Securities | 43 |
| Cross-Support | 43 |
| Overcollateralization | 43 |
| Financial Guaranty Insurance Policy | 43 |
| Mortgage Pool Insurance Policies | 44 |
| Letter of Credit | 45 |
| Special Hazard Insurance Policies | 46 |
| Reserve Funds | 47 |
| Cash Flow Agreements | 47 |
| Maintenance of Credit Enhancement | 47 |
| Reduction or Substitution of Credit Enhancement | 50 |
| OTHER FINANCIAL OBLIGATIONS RELATED TO THE SECURITIES | 50 |
| Swaps and Yield Supplement Agreements | 50 |
| Purchase Obligations | 51 |
| PRIMARY MORTGAGE INSURANCE, HAZARD INSURANCE; CLAIMS THEREUNDER | 51 |
| General | 51 |
| Primary Mortgage Insurance Policies | 51 |
| Hazard Insurance Policies | 53 |
| FHA Insurance | 54 |
| VA Mortgage Guaranty | 55 |
| THE COMPANY | 55 |
| IMPAC FUNDING CORPORATION | 55 |
| IMPAC MORTGAGE HOLDINGS, INC. | 56 |
| THE AGREEMENTS | 56 |
| General | 56 |
| Certain Matters Regarding the Master Servicer and the Company | 57 |
| Events of Default and Rights Upon Event Default | 58 |
| Amendment | 61 |
| Termination; Retirement of Securities | 63 |
| The Trustee | 64 |
| Duties of the Trustee | 64 |
| Some Matters Regarding the Trustee | 64 |
| Resignation and Removal of the Trustee | 65 |
| YIELD CONSIDERATIONS | 65 |
| MATURITY AND PREPAYMENT CONSIDERATIONS | 68 |
| LEGAL ASPECTS OF MORTGAGE LOANS | 69 |
| Mortgages | 69 |
| Cooperative Mortgage Loans | 70 |
| Tax Aspects of Cooperative Ownership | 71 |
| Leases and Rents | 71 |
| Contracts | 72 |
| Foreclosure on Mortgages and Some Contracts | 73 |
| Foreclosure on Shares of Cooperatives | 75 |
| Repossession with respect to Contracts | 76 |
| Rights of Redemption | 78 |
| Anti-Deficiency Legislation and Other Limitations on Lenders | 78 |
| Environmental Legislation | 80 |
| Consumer Protection Laws with Respect to Contracts | 81 |
| Enforceability of Some Provisions | 82 |
| Subordinate Financing | 83 |
| Installment Contracts | 84 |
| Applicability of Usury Laws | 84 |
| Alternative Mortgage Instruments | 85 |
| Formaldehyde Litigation with Respect to Contracts | 85 |
| Servicemembers' Civil Relief Act of 1940 | 86 |

High LTV Loans are underwritten with an emphasis on the creditworthiness of the related mortgagor. High LTV Loans are underwritten with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property.

In the case of the multifamily loans, commercial loans or mixed-use loans, lenders typically look to the debt service coverage ratio of a loan as an important measure of the risk of default on that loan. Unless otherwise defined in the related prospectus supplement, the debt service coverage ratio of a multifamily loan or commercial loan at any given time is the ratio of (1) the net operating income of the related mortgaged property for a twelve-month period which is to (2) the annualized scheduled payments on the mortgage loan and on any other loan that is secured by a lien on the mortgaged property prior to the lien of the related mortgage. The total operating revenues derived from a multifamily, commercial or mixed-use property, as applicable, during that period, minus the total operating expenses incurred in respect of that property during that period other than (a) non-cash items such as depreciation and amortization, (b) capital expenditures and (c) debt service on loans (including the related mortgage loan) secured by liens on that property. The net operating income of a multifamily, commercial or mixed-use property, as applicable, will fluctuate over time and may or may not be sufficient to cover debt service on the related mortgage loan at any given time. As the primary source of the operating revenues of a multifamily, commercial or mixed-use property, as applicable, rental income (and maintenance payments from tenant-stockholders of a cooperatively owned multifamily property) may be affected by the condition of the applicable real estate market and/or area economy. Increases in operating expenses due to the general economic climate or economic conditions in a locality or industry segment, such as increases in interest rates, real estate tax rates, energy costs, labor costs and other operating expenses, and/or to changes in governmental rules, regulations and fiscal policies, may also affect the risk of default on a multifamily, commercial or mixed-use loan. Lenders also look to the loan-to-value ratio of a multifamily, commercial or mixed-use loan as a measure of risk of loss if a property must be liquidated following a default.

Each prospective mortgagor will generally complete a mortgage loan application that includes information on the applicant's liabilities, income, credit history, employment history and personal information. One or more credit reports on each applicant from national credit reporting companies generally will be required. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions, or judgments. In the case of a multifamily loan, commercial loan or mixed-use loan, the mortgagor will also be required to provide certain information regarding the related mortgaged property, including a current rent roll and operating income statements (which may be pro forma and unaudited). In addition, the originator will generally also consider the location of the mortgaged property, the availability of competitive lease space and rental income of comparable properties in the relevant market area, the overall economy and demographic features of the geographic area and the mortgagor's prior experience in owning and operating properties similar to the multifamily properties or commercial properties, as the case may be.

Mortgaged properties generally will be appraised by licensed appraisers. The appraiser will generally address neighborhood conditions, site and zoning status and condition and valuation of improvements. In the case of mortgaged properties secured by single family loans, the appraisal report will generally include a reproduction cost analysis (when appropriate) based on the current cost of constructing a similar home and a market value analysis based on recent sales of comparable homes in the area. With respect to multifamily properties, commercial properties and mixed-use properties, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used. An appraisal employing the income approach to value analyzes a property's projected net cash flow, capitalization and other operational information in determining the property's value. The market approach to value analyzes the prices paid for the purchase of similar properties in the property's area,

with adjustments made for variations between those other properties and the property being appraised. The cost approach to value requires the appraiser to make an estimate of land value and then determine the current cost of reproducing the improvements less any accrued depreciation. In any case, the value of the property being financed, as indicated by the appraisal, must support, and support in the future, the outstanding loan balance. All appraisals are required to be on forms acceptable to Fannie Mae or Freddie Mac.

Notwithstanding the foregoing, loan-to-value ratios will not necessarily constitute an accurate measure of the risk of liquidation loss in a pool of mortgage loans. For example, the value of a mortgaged property as of the date of initial issuance of the related series of securities may be less than the Value determined at loan origination, and will likely continue to fluctuate from time to time based upon changes in economic conditions and the real estate market. Mortgage loans which are subject to negative amortization will have loan-to-value ratios which will increase after origination as a result of negative amortization. Also, even when current, an appraisal is not necessarily a reliable estimate of value for a multifamily property or commercial property. As stated above, appraised values of multifamily, commercial and mixed-use properties are generally based on the market analysis, the cost analysis, the income analysis, or upon a selection from or interpolation of the values derived from those approaches. Each of these appraisal methods can present analytical difficulties. It is often difficult to find truly comparable properties that have recently been sold; the replacement cost of a property may have little to do with its current market value; and income capitalization is inherently based on inexact projections of income and expenses and the selection of an appropriate capitalization rate. Where more than one of these appraisal methods are used and provide significantly different results, an accurate determination of value and, correspondingly, a reliable analysis of default and loss risks, is even more difficult.

If so specified in the related prospectus supplement, the underwriting of a multifamily loan, commercial loan or mixed-use loan may also include environmental testing. Under the laws of some states, contamination of real property may give rise to a lien on the property to assure the costs of cleanup. In several states, this type of lien has priority over an existing mortgage lien on that property. In addition, under the laws of some states and under the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, a lender may be liable, as an "owner" or "operator", for costs of addressing releases or threatened releases of hazardous substances at a property, if agents or employees of the lender have become sufficiently involved in the operations of the borrower, regardless of whether or not the environmental damage or threat was caused by the borrower or a prior owner. A lender also risks such liability on foreclosure of the mortgage as described under "Legal Aspects of Mortgage Loans—Environmental Legislation" in this prospectus.

With respect to any FHA loan or VA loans the mortgage loan Seller will be required to represent that it has complied with the applicable underwriting policies of the FHA or VA, respectively. See "Description of Primary Insurance Policies—FHA Insurance" and "—VA Insurance" in this prospectus.

**Qualifications of Originators and Sellers**

Each mortgage loan generally will be originated, directly or through mortgage brokers and correspondents, by a savings and loan association, savings bank, commercial bank, credit union, insurance company, or similar institution which is supervised and examined by a federal or state authority, or by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the Housing Act.

loan or mortgage security as described below. However, there can be no assurance that a Seller will honor its obligation to repurchase or, if permitted, replace any mortgage loan or mortgage security as to which a breach of a representation or warranty arises.

All of the representations and warranties of a Seller in respect of a mortgage loan or mortgage security will have been made as of the date on which the mortgage loan or mortgage security was purchased from the Seller by or on behalf of the company. As a result, the date as of which the representations and warranties were made may be a date prior to the date of initial issuance of the related series of securities or, in the case of a Designated Seller Transaction, will be the date of closing of the related sale by the applicable Seller. A substantial period of time may have elapsed between the date as of which there presentations and warranties were made and the later date of initial issuance of the related series of securities. Accordingly, the Seller's purchase obligation (or, if specified in the related prospectus supplement, limited replacement option) described below will not arise if, during the period commencing on the date of sale of a mortgage loan or mortgage security by the Seller, an event occurs that would have given rise to a purchase obligation had the event occurred prior to sale of the affected mortgage loan or mortgage security, as the case may be. The only representations and warranties to be made for the benefit of holders of securities in respect of any related mortgage loan or mortgage security relating to the period commencing on the date of sale of the mortgage loan or mortgage security by the Seller to or on behalf of the company will be the limited representations of the company and the master servicer described under "Description of the Securities—Assignment of Trust Fund Assets" below.

The company will assign to the trustee for the benefit of the holders of the related series of securities all of its right, title and interest in each purchase agreement by which it purchased a mortgage loan or mortgage security from a Seller insofar as the purchase agreement relates to the representations and warranties made by the Seller in respect of the mortgage loan or mortgage security and any remedies provided for with respect to any breach of representations and warranties with respect to the mortgage loan or mortgage security. If a Seller cannot cure a breach of any representation or warranty made by it in respect of a mortgage loan or mortgage security which materially and adversely affects the interests of the securityholders therein within a specified period after having discovered or received notice of a breach, then, the Seller will be obligated to purchase the mortgage loan or mortgage security at a purchase price set forth in the related pooling and servicing agreement or other agreement which purchase price generally will be equal to the principal balance thereof as of the date of purchase plus accrued and unpaid interest through or about the date of purchase at the related mortgage rate or pass-through rate, as applicable (net of any portion of this interest payable to the Seller in respect of master servicing compensation, special servicing compensation or subservicing compensation, as applicable, and any interest retained by the company).

As to any mortgage loan required to be purchased by a Seller as provided above, rather than repurchase the mortgage loan, the Seller, if so specified in the related prospectus supplement, will be entitled, at its sole option, to remove the Deleted Mortgage Loan from the trust fund and substitute in its place a Qualified Substitute Mortgage Loan; however, with respect to a series of certificates for which no REMIC election is to be made, the substitution must be effected within 120 days of the date of the initial issuance of the related series of certificates. With respect to a trust fund for which a REMIC election is to be made, the substitution of a defective mortgage loan must be effected within two years of the date of the initial issuance of the related series of certificates, and may not be made if the substitution would cause the trust fund, or any portion thereof, to fail to qualify as a REMIC or result in a Prohibited Transaction Tax under the Code. Any Qualified Substitute Mortgage Loan generally will, on the date of substitution:

- have an outstanding principal balance, after deduction of the principal portion of the monthly payment due in the month of substitution, not in excess of the outstanding principal balance of the Deleted Mortgage Loan (the amount of any shortfall to be